Motley v. Motley.

WILLIAM J. MOTLEY, Respondent, v. ANNA B. MOTLEY, Appellant.

**St. Louis Court of Appeals, April 1, 1902.**

1. **Divorce: INDIGNITIES: MISCONDUCT OF WIFE: EVIDENCE: SUFFICIENCY OF.** In a suit for divorce against a wife, evidence that she poisoned food prepared by her for plaintiff, towards whom she had a settled contempt, and continuously offered him indignities, to which he submitted without mistreating her, is sufficient to warrant a decree in plaintiff's favor.

2. **Alimony: PRACTICE, APPELLATE: REVIEW OF ALLOWANCE FOR ALIMONY IN APPELLATE COURT.** The appellate court can review an allowance for alimony in gross, or pending suit for divorce.

3. ———: ———: **MOTION FOR ADDITIONAL ALIMONY.** Where a motion for additional alimony in anticipation of appeal does not allege that defendant had expended what has been allowed pending suit, and no evidence is offered that the previous allowance was inadequate, the ruling on the motion can not be reviewed.

4. **Divorce: FORFEITURE OF RIGHTS BY GUILTY PARTY: STATUTORY CONSTRUCTION.** Under Revised Statutes 1899, section 2929, providing that in actions for divorce the guilty party shall forfeit all rights and claims by virtue of the marriage, where divorce is granted for misconduct of the wife, she forfeits her right to alimony for her maintenance.

Appeal from Pike Circuit Court.—*Hon. David H. Eby, Judge.*

AFFIRMED.

*Tapley & Fitzgerrel, W. O. Gray* and *J. D. Hostetter* for appellant.

(1) All of the indignities alleged in plaintiff's petition, in the case at bar, except the charge of poisoning, were

trivial, ancient, and had been condoned, if indeed they ever constituted offenses which would justify a severance of the marital ties. As to the charge that defendant attempted to take plaintiff's life by administering strychnine poison, she certainly is entitled to the same presumption of innocence which would prevail in the event she were arrested and required to be defendant against such a charge in the criminal courts, and it certainly follows that the same *quantum* of proof would be required to establish her guilt in the case at bar, as it would in a criminal case. Before a court could properly find against her in this case on that issue she should be proven guilty beyond a reasonable doubt. 1 Rice on Evidence, sec. 85, p. 125. (2) The court erred in making the allowances to the defendant so meager and insufficient. Defendant was confronted with a grave criminal charge. She was an invalid and practically without means. She was, therefore, by reason of this pecuniary embarrassment, unable to procure the necessary means and witnesses; medical and otherwise, to clear herself of the awful charge that was made against her. It goes without saying that the sums allowed by the court were grossly inadequate and insufficient for any purpose.

*R. L. Motley, Dempsey & McGinnis, Ball & Sparrow* and *E. W. Major* for respondent.

(1) While in divorce cases, it is the province of the appellate court to make its own deductions from the evidence, independent of the findings of the trial court, yet where the evidence is conflicting and contradictory on material issues, the appellate court will defer largely to the findings of the court below, and will not disturb same unless it is made clearly to appear that manifest error has been committed in the conclusions reached by the trial court. King v. King, 42 Mo. App. 454; Lawlor v. Lawlor, 76 Mo. App. 637; Munchow v. Munchow, 78 Mo. App. 99; Torlotting v. Tor-

Motley v. Motley.

lotting, 82 Mo. App. 192; Endsley v. Endsley, 89 Mo. App. 596. (2) The indignities which the evidence establishes beyond a doubt were offered to respondent, are such as the appellate courts recognize as being indignities contemplated by the statutes, and authorizing a decree. Lynch v. Lynch, 87 Mo. App. 32; Goodman v. Goodman, 80 Mo. App. 274. (3) Alimony may be allowed in the discretion of the court and is not an absolute right. The appellant in this case had no absolute right for any allowance whatever, and if nothing had been allowed her, that fact would be of no avail upon appeal. Penningroth v. Penningroth, 71 Mo. App. 438.

BLAND, P. J.—Omitting caption and immaterial allegations, the petition alleges in substance that plaintiff and defendant were married in the month of November, 1876, and continued to live together until the ——— day of May, 1901, when the plaintiff separated himself from the defendant. The petition alleges sundry indignities offered by defendant to plaintiff beginning in the year 1889 and continuing down to the date of the separation, some of which indignities are so vile and vulgar in character that we decline to state them in detail, as we deem it unnecessary from the view we take of the evidence in the case. The most serious allegation contained in the petition is that the defendant kept poison in her possession and in the month of April, 1891, threatened to poison plaintiff and that on the third day of May, 1891, she deposited and intermingled poison of some kind in the plaintiff's food, which she had prepared for him to eat, and that he ate of the food and was poisoned thereby.

The answer denied the indignities and the poisoning alleged in the petition, and by way of cross-bill alleged that the plaintiff had offered to her such indignities as to render her condition in life intolerable, which are set out in detail in the cross-bill.

The evidence offered by the plaintiff satisfactorily es-

tablishes the truth of several of the indignities set out in his petition and tends to show that defendant had a violent temper; that she believed herself to be superior to the plaintiff, intellectually and otherwise; that she often charged the plaintiff with not having good sense. At times she would not eat at the same table with him and would go for a week or ten days without speaking to him and it was not an unusual thing for her, in the presence of others, to call plaintiff an "old ash cat," and "old fool," and use vile and vulgar epithets towards him; that she would correct his language when in conversation with others, tell him to "hush up" that he was an "old fool" and that he was just like his old ignorant mother, and speak of his mother in his presence using such epithets as "old witch," "old sloven," and "old slut;" that she would not visit plaintiff's family nor permit them to visit him at his home.

The evidence further is that in the presence of other people she would express a wish to die; would say that life was no pleasure to her as plaintiff was mean and that she had poison and intended to use it.

Prior to May, 1891, she had tried to induce the plaintiff to make a will and leave his property to her during her life, remainder over to her brother, Charles Robinson. This plaintiff declined to do. On many occasions she made threats and said she would have his property if she had to wade through blood to get it.

The day previous to the alleged poisoning, defendant stated to a Miss Shadwell, while speaking of plaintiff and his property, that plaintiff had required her to work and help make the property like Mr. Uptergrove (a neighbor) had his wife and that if she had a husband like Mr. Uptergrove she would give him a dose and then stated, "I have got one just like him." A short time prior to this she stated to Miss Shadwell and to another lady that she would not be surprised at anything, that people were so mean they would do anything

for money and that they need not be surprised at her killing Willie (meaning her husband) or he killing her. When Miss Shadwell was last at her house and when she started to leave she said to her, "Remember there is going to be something awful happen after you are gone and you will hear of it."

Plaintiff and defendant lived on a farm in the country. They had no children. On the third day of May, 1901, defendant prepared breakfast for the plaintiff. The plaintiff ate of the breakfast prepared by her. He ate some meat, biscuit and butter and eggs, and drank a cup of coffee. The defendant did not eat of the breakfast. After he had finished his breakfast he walked from the dining-room to the kitchen, took a dipper of water and rinsed his mouth and then walked to the smoke house, took up his milk bucket and proceeded on towards the barn to milk, which was about fifty or sixty yards from the house. When he reached the barn fence he was all over in a quiver and his muscles were jerking. Realizing what had happened he did not return to the house or call to his wife but leaned against the fence and held on for support and called for a colored man by the name of Parsons, who lived near by. Parsons heard him and came to his assistance. Before he reached him he had fallen to the ground. Ben Young, James Young, James Hill, Fount Anson, James Wilson and Mrs. Emily Young, living near by were warned of the condition of plaintiff and came to his assistance. They carried him into the hall of the barn and laid him on some straw and chaff and Parsons went for a doctor. Ben Young procured oil and milk, warm water and salt and administered it to plaintiff. This caused him to vomit.

The evidence of the parties named above, who were the first to reach him, said he suffered from a severe hurting in his breast that seemed to draw and choke him so that he could scarcely breathe; that he had convulsions from five to fifteen minutes apart; had cramps and was drawn forward and then backwards and sometimes sideways and that his limbs would

draw and then expand out to their full length; that his whole body was in a quiver; that he frothed at the mouth; that his head was drawn sideways and backwards; that his eyes were red and bloodshot and watering, that his face was flushed and hot and indicated excessive pain.

Dr. J. D. Davis, Dr. Reid, Dr. J. J. Kincaid, Dr. Walters and Dr. Motley, who qualified as experts and heard the evidence of the witnesses who described plaintiff's symptoms, testified that the symptoms indicated the plaintiff was suffering from poison and that the poison was strychnine or some of its salts. The defendant undertook to show that the poison might have been from meat or decayed substances but the physicians stated that in ptomaine poisoning the symptoms do not develop earlier than from twelve to forty-eight hours after the poison is taken into the system. The meat which plaintiff ate for his breakfast was shown to be sound, and wholesome, meat which he had raised on his own premises and had butchered and cured on his farm.

The evidence is also that the plaintiff was in perfect health when he ate his breakfast and had been for some time previous.

There is evidence also in the record which tends to show that the defendant was very uneasy while the plaintiff was suffering from the poison for fear that she might be accused of having administered it to him and stated that the plaintiff was in love with Miss Shadwell and had taken the poison with the intention of casting a slur upon defendant and for the purpose of getting rid of her; that without being accused of having administered the poison, she stated to Mrs. Young "Thank God, my skirts is clear." After Motley had been taken to his house, on the morning of the same day the poison was administered and while he was suffering from the effects of it, defendant said to Mrs. Young that she "never was in such a fix in her life;" that she "had never went through such a thing in her life before;" that she went in and looked

at the clock and said, "It is half past ten and time dinner was on" but didn't know whether to get dinner or not, and said, "If I get dinner I don't know whether there is any one here will eat a bite I would cook" and asked Mrs. Young if she would see every bite she cooked.

The evidence is that the defendant had not been anywhere from home for some months prior to the poisoning and had had no opportunity to procure poison. There is evidence, however, that not a great while previous to the poisoning she had been in the city of St. Louis, the cities of Troy and Silex, in Lincoln county, and Louisville, in Pike county, where she could easily have gotten poison, and she had repeatedly stated to the plaintiff and to others that she had poison in the house.

The Miss Shadwell, of whom she seems to have been somewhat jealous, was proven to be a young woman of good reputation and the defendant herself admitted to some of the witnesses that she (Miss Shadwell) had always conducted herself as a lady at all times; that she was the best help she ever had in the house and that she couldn't say anything against her and admitted on the trial that she was a virtuous woman.

There are two hundred and seventy-five printed pages of the evidence in this case, a summary of which would extend this opinion to an unwarranted length. We think the preponderance of the evidence is that the defendant did, on the third day of May, 1901, put strychnine or some of its poisonous salts in food prepared by her for the plaintiff with the intention that plaintiff should eat the food so prepared by her. There is also evidence which shows to our satisfaction that the defendant held the plaintiff in contempt and had a settled hatred towards him and towards his family; that from the year 1889, down to the date of the separation, she continued to offer to him such indignities as to render his condition in life intolerable. There is no substantial evidence in the record tending to show that the plaintiff ever mistreated the defendant; on the contrary the evidence is that he sub-

mitted to her indignities and treated her with remarkable kindness under the circumstances. His condition in life seems to have been one of long suffering under continued indignities. The court found the plaintiff to be the innocent and injured party and awarded him a decree of divorce. That this is a just and righteous finding we are fully persuaded by the evidence.

On a motion for alimony pending the suit the court allowed defendant seventy-five dollars as attorney's fee and forty dollars per month for maintenance and fifteen dollars as suit money. After the decree of divorce had been awarded, pending a motion for new trial, defendant filed her motion for additional alimony. On this motion the court allowed one hundred and twenty-five dollars for attorney's fee for the prosecution of her appeal and seventy-five dollars for attorney's fee and forty dollars a month pending the appeal, should one be taken, and ordered the plaintiff to pay the costs of stenographer's transcript, the clerk's transcript of the record, the filing fee in the appellate court and the cost of printing brief, to which action of the court defendant then and there excepted on the ground that the same was meagre and insufficient and duly saved her exceptions. It will thus appear that with the affirmance of the judgment will cease the alimony allowed to the defendant.

The evidence is that the defendant had been an economical and industrious woman and had done her part towards accumulating a good share of plaintiff's property; that they lived together for about twenty-five years on a farm and that during all this time continued to accumulate property from year to year; that she is now an invalid. The evidence is that plaintiff is possessed of property, money and effects valued at from nine to fifteen thousand dollars; that the only property that the defendant has is an undivided interest in some real estate in Lincoln county worth probably two thousand dollars.

Motley v. Motley.

This court has appellate jurisdiction to review an allowance for alimony in gross or pending suit. Lawlor v. Lawlor, 76 Mo. App. 293. In the motion for additional alimony pending motion for new trial and in anticipation of appeal, it is not alleged as a ground in said motion that defendant had expended or had contracted to pay money over and above what had theretofore been allowed her by the court as alimony pending the suit and for attorney's fee and no evidence was introduced tending to show that the allowance theretofore made by the court was inadequate. No evidence was heard on the motion and there is therefore nothing before us for review. But it is contended by defendant's counsel that, as she for twenty-five years assisted the plaintiff in the accumulation of his property, in equity and good conscience she is entitled to a portion of it.

Alimony, as distinguished from suit money, is founded on the duty of the husband to maintain the wife and it is the duty of the judiciary to enforce this duty in a proper case. In recognition of this duty the Legislature has enacted section 2927, Revised Statutes 1889, which provides that the court, when it renders a decree of divorce in favor of the wife, may allow alimony to her in gross or from year to year and make the same a lien on the husband's real estate, thus enforcing upon the husband the duty of maintaining his wife who has been legally separated from him on account of his wrongdoing. No such consequences follow after a decree of divorce for the husband on account of the wrongdoing of the wife. When she is found to be the guilty party she forfeits all her rights and claims under and by virtue of the marriage. Section 2929, R. S. 1899; 1 Bishop on Marriage, Divorce and Separation, sec. 861. This forfeiture includes the right of maintenance by her divorced husband. The defendant by her misconduct has forfeited all claims for alimony or main-

tenance and we are without authority to award any additional alimony in the cause.

The judgment is affirmed. *Barclay* and *Goode, JJ.,* concur.